LUCINDA J. FISHER v. WM. KOONTZ, Administrator, *et al.,* Appellants.

**Ante Nuptial Contract:** VALIDITY. An ante nuptial contract, providing that the wife shall acquire no interest in the husband's estate, is binding.

CONSIDERATION. Marriage is a sufficient consideration for an ante nuptial contract whereby the wife relinquishes her marital rights in the husband's property.

CONDONEMENT AS CONSIDERATION. Where a wife, who has merely threatened to leave her husband and sue for divorce, on account of his cruelty, condones past wrongs, the condonement is not such a consideration as will support an oral contract made between them canceling an ante nuptial agreement and restoring her marital rights in his estate.

ATTITUDE OF COURTS TOWARD. Courts will rigidly scrutinize an ante nuptial contract, apparently unjust, especially where it deprives the wife of her interest in the husband's estate without providing for her in case she survives him.

SAME: *Burden of Proof.* The burden is upon the husband, or his representative, to show that an ante nuptial contract, apparently unjust to the wife, was fairly procured.

SAME. An ante nuptial contract, whereby a wife relinquishes her marital rights in her husband's estate, will be upheld where it appears she knew the extent of his estate and was ready to waive such rights in order to overcome the opposition of his children to the marriage.

FORFEITURE: *Condoned cruelty.* Cruel and inhuman conduct by a husband to his wife, condoned by her, does not work a forfeiture of an ante nuptial contract between them.

CANCELLATION BY POST-NUPTIAL CONTRACT. Code, section 3154, providing that "when property is owned by the husband or wife the other has no interest therein which can be the subject of contract between them," does not prohibit a husband and wife from making a post-nuptial contract cancelling an ante-nuptial agreement and restoring her marital property rights, which she had relinquished.

STATUTE OF FRAUDS. If it be assumed that an oral post-nuptial contract cancelling an ante-nuptial agreement and restoring to a wife her marital rights in her husband's real estate is a contract relating to the "creation of an interest in lands," and that, therefore, unless the purchase price, in whole or in part, has been paid, it is void under the statute of frauds, the "purchase price" would be paid if a good consideration passed.

**Husband and Wife:** INCHOATE DISTRIBUTIVE SHARE: *Conveyance*. The inchoate distributive share of a wife in her husband's estate is property, within the meaning of Code, section 3157, authorizing a husband or a wife to execute conveyances to the other.

*Appeal from Monroe District Court.*—HON. F. W. EICHEL-BERGER, Judge.

WEDNESDAY, OCTOBER 18, 1899.

ACTION by the plaintiff, as widow of T. J. Fisher, deceased, to have her distributive share in certain real estate of which he died seized set apart to her. The administrator and heirs set up in their answer the execution of an ante-nuptial contract by the terms of which the plaintiff had agreed that she should "not have, as wife or widow, any interest of any kind, by way of ownership, in any property, real or personal, now owned by Thomas J. Fisher." In her reply the plaintiff averred that this contract was procured through fraud, had been forfeited by cruel and inhuman conduct, and that it was annulled and canceled by a postnuptial agreement. Decree was entered as prayed, and the defendants appeal.—*Reversed*.

*Townsend & Mason, W. A. Nichol,* and *T. B. Perry* for appellants.

*N. E. Kendall* for appellee.

LADD, J.—The plaintiff and the deceased were married August 31, 1893, she then being forty-two and he sixty-eight years of age, and they lived together until his death, in 1897. Prior to their marriage, a contract was entered into by them, whereby she was to acquire no interest in his property. That such a contract is binding is well settled. *Jacobs v. Jacobs,* 42 Iowa, 600; *Ditson v. Ditson,* 85 Iowa, 276; *Peet v. Peet,* 81 Iowa, 172. Fisher then owned property of the estimated value of over twelve thousand dollars. No provision whatever was made for his wife,

nor did he waive his prospective interest in her estate, valued at five hundred dollars. The marriage furnished a valuable consideration, sufficient upon which to base the relinquishment made by the wife. Schouler, Domestic Relations, section 173; 2 Parsons, Contracts (6th ed), 75; *Mitchell v. Morey,* 26 Md. 239; *Pierce v. Pierce,* 71 N. Y. 154; 14 Am. & Eng. Enc. Law, 545. After engagement, however, the parties stood in a relation of confidence, and each had the right to expect the utmost fairness in all their dealings. The husband was bound to frankly and truthfully disclose all facts and circumstances which might in any way affect the agreement to be made. The courts will rigidly scrutinize an antenuptial contract apparently unjust or unreasonable in its terms, and especially where it operates to deprive the wife of her interest in the husband's estate without provision for her in event she survive him. *Kline v. Kline,* 57 Pa. St. 120; *Graham v. Graham,* 143 N. Y. App. 573 (38 N. E. Rep. 722). In such a case the burden is cast upon the husband, or those who represent him, to show that the contract was fairly procured, in order to have it upheld. *Spurlock v. Brown,* 91 Tenn. Sup. 241 (18 S. W. Rep. 868); *Achilles v. Achilles,* 151 Ill. 136 (37 N. E. Rep. 693); Russel's Appeal, 75 Pa. St. 269; *Pierce v. Pierce, supra.*

II. Was the antenuptial contract fairly procured? The plaintiff insists that she was deceived in two respects: (1) In the amount of property owned by the deceased, and (2) by his representation that the agreement would not affect her contingent interest in his property. The evidence very satisfactorily establishes her knowledge of the extent of decedent's property before their marriage. She had visited his farms with Mrs. Rampe, and walked over them with him. They would hardly have done so without speaking of the ownership of the land. That they so did is established by the evidence of several witnesses, and is con-

tradicted only inferentially by her daughter. Nor do we think this record justified the conclusion that she was induced to execute the contract on his representation that it would not deprive her of an interest in his property. True, her daughter declared that he so stated at the time the contract was drawn, and three other witnesses testified, in substance, that the deceased had said to each of them that he had told his wife the contract would not cut her out of her part in his estate. But, in the nature of things, the evidence of these witnesses cannot be directly contradicted, and for this reason must be scrutinized with caution. *Markey v. Markey,* 108 Iowa, 373; *Watson v. Richardson,* 110 Iowa, *post.* On the other hand, Young, who prepared the instrument, and read it over to her, stated that he then expressed his belief that it would be binding on both parties. The children of the deceased were objecting to his marriage to the plaintiff, and the contract was made in part to meet their opposition. This she well knew. Was she signing it to deceive them? Mrs. Rampe, her husband, and three other witnesses related that she had spoken to them of this contract, and had justified herself in executing it on the score of thinking it would not be right for her to come in and take what he and his first wife had accumulated by hard work. In 1895 a postnuptial contract, expressly recognizing the former agreement, was executed, and Ramsay, who prepared it, swore that it was read over to them, and approved. Though the evidence is somewhat conflicting, there is little doubt but that the plaintiff fully understood the purport of the contract. She was anxious to marry the deceased, and was ready to waive any interest to be thereby acquired in order to overcome the only obstacle in the way, to-wit, the opposition of his children.

III. If the deceased was guilty of cruel and inhuman conduct, his offense had been entirely condoned by the plaintiff. This was done, not only by continually living with him thereafter, but by her express promise to do so. Under such circumstances, an action for divorce could not have been maintained, and we are of opinion that

a forfeiture of the antenuptial contract did not result. As the parties had lived together happily long after she had forgiven his wrongs, if any there had been, she accepted his conduct as fulfilling his obligation as a husband. In *York v. Ferner,* 59 Iowa, 487, there was no condonement, and for this reason the case is not in point.

IV. But it is contended that the condonement was brought about and based on a postnuptial contract, by the terms of which the antenuptial agreement was canceled and annulled, and the right to a distributive share restored to the wife. Such an arrangement was not prohibited by section 3154 of the Code, providing that, "when property is owned by the husband or wife, the other has no interest therein which can be the subject of contract between them." The paintiff had no interest in his estate, as she had been deprived of that by the antenuptial agreement. The oral contract, then, did not have for its subject her interest in his property, but an interest which he held in that of his own, and which she sought to acquire. Not only were they not prohibited from dealing with such an interest, but a subsequent provision of the statutes (section 3157) expressly authorized "a conveyance, transfer, or lien, executed by either husband or wife to or in favor of the other." True, the postnuptial contract dealt with the inchoate distributive share of his estate which would have been acquired by her but for the prior agreement; yet it was none the less his property, and might be the subject of contract between them. Such a conclusion is not only in harmony with the statutes, but, in permitting the restoration of marital property rights, comports with sound public policy; otherwise, the hands of the husband and wife might be tied up forever by an understanding entered into before learning fully of the mutual trust and confidence engendered by and essential to well-being in that relationship.

V. Nor do we deem the evidence of the agreement in parol, under the circumstances of this case, necessarily inad-

missible. Let it be conceded, for the purpose of this case, that the contract relates to "the creation or transfer of an interest in lands" *(Dunlap v. Thomas,* 69 Iowa, 358), and unless the purchase money in whole or in part, has been paid, it is within the statute of frauds, (Code, sections 4625, 4626; *Craig v. Craig,* 90 Ind. 215; Schouler, Domestic Relations, section 183). We have held that "purchase money," as used in section 4626, means the consideration. *Devin v. Himer,* 29 Iowa, 297; *Stem v. Nysonger,* 69 Iowa, 512; *Harlan v. Harlan,* 102 Iowa, 701. If, then, a good consideration passed to the deceased, on which was based an agreement abandoning the antenuptial contract, and granting the plaintiff the usual inchoate rights of a married woman in her husband's property, such agreement should be upheld. The discontinuance of a meritorious suit for a divorce, and the resumption of the married relations, has been held a sufficient and valid consideration for a conveyance of land or promise to pay money. *Reithmaier v. Beckwith,* 35 Mich. 110; *Duffy v. White,* 115 Mich. 264 (73 N. W. Rep. 363); *Adams v. Adams* 91 N. Y. 376; *Phillips v. Meyers,* 82 Ill. 67; Burkholder's Appeal, 105 Pa. St. 37; *Sterling v. Sterling,* 12 Ga. 201; *Jodrell v. Jodrell,* 9 Beav. 45; *Rozell v. Redding,* 59 Mich. 331 (26 N. W. Rep. 498). We have upheld a contract for the division of property in event of a decree of divorce being entered in a pending suit. *Martin v. Martin,* 65 Iowa, 255; *Nieukirk v. Nieukirk,* 84 Iowa, 367. Much stronger are the reasons for sustaining such agreements when based on an adjustment of differences, and a restoration of the family relation. Whether a return of the wife, after separation, on sufficient cause, where no action for divorce is pending, is a good consideration, such as will support an agreement to pay money, has not been settled. On the one hand, it is said such restoration of the conjugal relations must be conclusively presumed to have resulted from forgiveness and condonement of past wrongs, and that, because

of the marriage status and the interests of society, it cannot be allowed to rest on so base a motive as that of acquiring money or property. On the other hand, it is asserted that, as the wife has the right, owing to the husband's fault, to live apart from him, to return to him, as it involves doing something she is under no obligation to do, may be a valid consideration. The opposing views are tersely stated by Justices Allen and Holmes in *Merrill v. Peaslee,* 146 Mass. 460 (16 N. E. Rep. 274). Here there was no separation, nor action for divorce pending. Conceding the cruelty to have been established, there was no return of the wife, or restoration of the former relations, or dismissal of an action, as a basis of the alleged arrangement. There was simply an unexecuted threat to leave and institute suit for divorce and alimony, and we think refraining from carrying it out, and continuing in the existing relation, must be attributed to motives other and higher than those merely pecuniary. The troubles and difficulties of married life, which the husband and wife have forgiven or ignored without separation or suit, ought not to be unveiled to the public after death has severed that relation. Compensation for wrongs, under such circumstances, cannot be made in money. Their adjustment of differences must be conclusively presumed to have sprung from mutual affection, the interests of home and children, and their well-being in society, and not to have been induced by greed of worldly gain. See *Miller v. Miller,* 78 Iowa, 177. Public policy forbids such inquiries, and the sacredness of the relation demands that conjugal consortium be kept without the domain of bargain or sale.

VI. We do not understand anything to be claimed for the talk concerning the collection of the rent of the plaintiff's property by the deceased. If he was to have the use of it for life, no writing was drawn, as is made necessary under the statute of frauds, nor was it shown that he received the rent in pursuance of such an arrangement. We conclude

that, as the antenuptial contract remains in force, the plaintiff is not entitled to a distributive share in the real estate in controversy.—REVERSED.

GRANGER, C. J., not sitting.